Good morning. This is the matter of Charles Eugene Cross v. James Price. They are in fact consolidated appeals. Mr. Carsoni, you should go forward for the count. Yes, Your Honor. May it please the Court, Chris Carosone, Attorney General's Office for the Commonwealth. I'd like to request five minutes for rebuttal, Your Honor. Granted. Thank you. The District Court got it right the first time when they concluded that Cross suffered no prejudice from his own testimony concerning parole eligibility. And the District Court was wrong to, years later, reverse its opinion based on this Court's decision in Carpenter v. Bond. Carpenter is completely distinguishable from the situation presently in front of the Court. I trust you'll tell us how so. Yes. First of all, in this case, the information concerning parole eligibility came from Cross himself. Why should that matter? It matters because the jury was free to disregard it, and it ultimately matters in terms of the question of prejudice. Why should it matter what the source of the impermissible information and incorrect information was? Judge v. Defendant. And I ask that question with an eye toward the Pennsylvania cases, which, by my reading, seem to be concerned with two things, relevancy and, ultimately, prejudice, when that information gets before a jury. Well, I think on the latter question of prejudice, the form in which that information is communicated to the jury and the power that they have to either reject it or to follow it. I understand that's what you're saying. I'm asking why. Why should the source of the information have any effect on the discussion of the jury or the extent to which that information impinges upon their decision-making? Ultimately, and I'm not sure if I'm answering your question, but ultimately, it's a question of how powerful. Well, you've said that one of the distinctions is, in our case, the information came from the defendant himself. In the other case, Carpenter, it came from the court. And I want to know why the source ought to matter if the jury has the same information. Because it's the weight that they would attach to that, Your Honor. The testimony, a jury is instructed that it may accept testimony, it may reject testimony. Are you suggesting that the jury might not have believed that he was eligible for parole over 20 years? Yes, Your Honor. And I don't think they believed a word out of Cross's mouth. He's a guy that had basically denied his involvement in the murder despite overwhelming physical evidence in the country. But saying that you understand that you're eligible for parole in 20 years is a matter of a very different character than saying that he murdered somebody. Because that's the kind of a thing that is subject to easy verification. And I couldn't help but wonder why somebody didn't tell the jury that that's wrong. Because as far as I could see, this wasn't a question of weighing evidence. Somebody else said, no, he's not eligible for parole but another witness. And then you had two witnesses. This was just a statement and no one corrected it. Well, I think the answer to your question about why no one corrected it is twofold. Number one, there were factual findings made by the Pennsylvania courts that this matter was discussed with Cross and that they had made a decision to not address it, to not highlight it in front of the jury. But the jury doesn't know that. The jury hears something. The jury hears the defendant say, you know, when I get out on parole and get on with my life. And since no one contradicts it, since no one says that's not so, why should they not believe that? Actually, someone, Your Honor, did contradict it. It was his own lawyer. But please tell us exactly what the words of defense counsel were in that closing argument. Because I read it, re-read it and re-read it. And to me, there is considerable ambiguity about, at best, as to what defense counsel was addressing. He made some key statements that it was his testimony was by all means irrelevant and that it doesn't matter what he says. He never explicitly tied that irrelevancy to the mention by the defendant of parole. But he said all of his testimony was irrelevant. It was stronger than that. It was stronger Mr. Carrasone, doesn't the fact that this statement was made by Cross and was never contradicted by either the court or by defense counsel or, for that matter, by the prosecutor, doesn't that lend weight to this statement as far as the jury's consideration of it is concerned? The instruction that counsel was held to be ineffective for requesting below was specifically prohibited under Pennsylvania law. Did the jury know that? No. So? The jury heard one... All right, the jury didn't know that. The jury didn't know that it was prohibited. The jury heard it and no one contradicted it. His lawyer contradicted it and then... You say that the lawyer contradicted it. I agree with Judge Smith that I find no specific reference to that particular statement and I believe that what the lawyer was saying more was his denial that he did it, don't pay attention to that, you've gotten beyond that point. I think the lawyer's statements are more powerful, Your Honor, with all due respect, than simply saying parts of what he said disregard, parts are irrelevant. He said disregard, he said it's irrelevant, it doesn't matter what he says. Also, very important, after his testimony the court properly instructed the jury on the law to be followed under Pennsylvania's death penalty statute. There was no room there for consideration of parole and juries are presumed to follow their instructions. Mr. Kerrison, you referred just a few moments ago to Pennsylvania law and I believe you suggested, as you have in your brief, that Pennsylvania law dictated counsel's reticence here in making any kind of corrective statement or request. Actually, more precisely, Your Honor, I said that the jury instruction that the district court found counsel should have asked for was specifically prohibited under Pennsylvania law. Please tell me the case because I think I've read every one of the cases and I have not seen a single Pennsylvania case. I was trying homicide cases back in the early 80s as a district attorney and then as a state trial court judge. I do not know of a single case that even intimates that counsel should not correct or seek correction of a misstatement of law by someone, be it a client, an adversary, or the court. Can you cite me to a single Pennsylvania decision that supports that proposition? Your Honor, the decision that I'm citing, which is specific to instructions concerning life without parole, is the Thompson decision. Now, that's a 1999 Pennsylvania Supreme Court case. It is cited in my brief and it indicates that prior to Simmons, Pennsylvania law expressly prohibited juries from being informed that life meant life without parole. So, I am correct, not only generally, but as it applies to the decision in Thompson that it did not deal with a situation where a misstatement was made and there was a need to correct it. That's true, that's true. This was Justice Castile's opinion. Right. However, Your Honor, again, there was this discussion between Cross and his counsel and the Pennsylvania courts found this as a factual matter. There was a discussion, they discussed the situation, they agreed that nothing should be done about it. As a result, given Cross's decision, he's waived any argument that he should be entitled to this and should have requested this jury instruction. This is a case that I don't think was referred to by either side. I've checked the briefs and didn't see it noted in the front of either of the briefs. It's Commonwealth versus Edwards. In fact, we found this just last evening. It's 555 Atlantic 2nd, 818. Are you by any chance familiar with Edwards? I'm not, Your Honor. In Edwards, there was a sidebar conference at which the court instructed the jury, I want to correct one statement I made to you initially concerning the parole. I want to caution you that it is not the parole board really that can commute a life sentence. Only the governor can commute a life sentence. The court had led the jury to think otherwise and then the court went on to the instruction that it's irrelevant and an instruction consistent with the previous Pennsylvania case law that you're familiar with. Interestingly, the Supreme Court of Pennsylvania in this decision in 1989 said we find that the court's curative instructions were adequate and there's no reason to disturb the jury's sense of death. Now, I realize that that's not saying this is what a court should do, but it was at least putting its imprimatur, it seems to me, on the propriety of what the trial judge here did to correct a misstatement relative to parole. I understand what the court's concern is, Your Honor, but in that case, as in Carpenter, the court took it upon itself to correct its own mistake, to correct its own error. In this case, this was a statement made by Cross, a self-inflicted wound by Cross, and the question was, could counsel have requested a cautionary instruction, and specifically a cautionary instruction that said, don't disregard this testimony, the specific cautionary instruction that current counsel said he should have asked for was life means life without parole, and you had a line of Pennsylvania cases which said that that was not an instruction that the courts could have given prior to Simmons. Even in face of a misstatement to the jury? Your Honor, I believe that that's correct. In any of those cases, was there a misstatement to the jury? Only under the Edwards case by the judge himself, as opposed to counsel. So it's not the case we're dealing with today? Well, that is one difference between those cases in this case, but I don't believe that it is a material difference. Counsel, I suppose this question is perhaps more viscerally bound than jurisprudentially, though I hope not entirely. Doesn't it at least bother you that this jury made a decision of life or death based upon a flat-out incorrect statement, all being by the defendant himself, of law? No, and here's the reason why, Your Honor. The evidence in this case was overwhelming. The evidence of aggravating circumstances were overwhelming. But that's the problem, the aggravating circumstances, the violent tendencies of this man. If the jury thinks there is a chance he will get out on the street, they're going to make sure he shouldn't. The only way that someone with that much testimony about his violence, and there's even worse that could have come out, but anyway, what did come out was that this is a guy who was violent, who was going to have these episodes during the rest of his life, and the jury, if they think there is any chance of this guy getting out on the street again, if he gets life in prison, I think very clearly they're going to vote for the death penalty. And a guy with an aggravating circumstance that involved a crime committed while on parole. Your Honor, I understand the court's concerns, but I honestly believe that these two sentences that came out of his mouth, when considering the vast majority of evidence against him, the great weight of the aggravating circumstances... There's no doubt that he did it. The question is, can... The evidence is overpowering, but in deciding whether... The jury in deciding whether to give him life in prison with no chance of getting out for the death penalty is not... Decision between those two outcomes very much affected if they believe that life in prison does not mean life in prison, but the possibility of parole. Your Honor, I think the court is assuming that... That's not my... I asked the question. I'm not... What I'm assuming you don't need to worry about. My question is, isn't... Isn't that choice given to the jury very much skewed if the possibility of life in prison they think includes parole? I don't think it is, Your Honor. I don't believe that this... These two sentences skewed the jury's determination. Again, when you consider the fact that it came in the form of testimony that counsel urged the jury to disregard and was followed by jury instructions which left no room for consideration of parole. And I believe under those circumstances what was fleeting references to parole and the possibility of parole were extinguished. And when you compare that against... I'm not just talking about the great weight that the guilt face. I'm talking about the strength of the aggravating circumstances themselves. Right. The guy was convicted of rape and sodomy. Right. That's what I say makes it all the worse in this case because this is a violent man who committed a violent crime on parole and the possibility that a life sentence means a chance of parole I think is going to very much influence a jury's determination whether to give him life in prison or death. Your Honor, again, I understand the court's concern. We come back to the question, though, of this matter and the factual matter that Pennsylvania courts found that this was discussed with Cross. Counsel discussed it with him and they mutually decided not to do anything about it. Did the Pennsylvania courts say that there had been a waiver? Your Honor, they... Obviously, we have to give a high level of deference to fact-finding. And I understand as far as fact-finding is concerned what the Pennsylvania Supreme Court ultimately in the PCRA proceeding found took place here as a matter of historical fact. There was no determination here that there was actually a waiver. Your Honor, you're talking about the difference between a factual finding and a legal determination. As a factual finding, the Pennsylvania courts found that this conversation took place and that they decided that nothing should be done about it. The legal consequence from that factual finding, which is up to this court to decide, is that constitutes waiver. That there was a decision made... Well, of course, if he's not informed it can't be a waiver, can it? And if it's ineffective advice from counsel that goes to the issue we're determining here today too, does it not? Your Honor... Is it effective assistance from your counsel if you have a violent defendant opened up to the jury the consideration that you may be paroled? Will an effective counsel say, Oh, that's not going to make any difference. That's no problem. Let's just forget about it. The question is what to do about it. Whether to let it go and leave well enough alone or make it worse by highlighting it again in the form of a jury instruction. How are you going to make it worse? I think it's, Your Honor, I think it is pretty well established in the law that counsel can refrain and it's a reasonable strategy to refrain from requesting a cautionary instruction Mr. Carrasone the cautionary instruction would have been a corrective instruction. What this jury knew as a result of Cross' statement or thought they knew was that Cross had an opportunity for parole in 20 years. We're assuming they believed that. We're assuming they accepted that. No one disabused them should not someone have disabused them of that misstatement. I think his and I know Your Honor that we disagree but I think that his counsel disabused him when his counsel said disregard or said his testimony was irrelevant and it doesn't matter what he said. Also something else that I'd like to point out in Carpenter this court appeared particularly concerned with the fact that the jury had asked a question concerning parole. In this case there is no such question. Again we're assuming that this these fleeting references to parole eligibility after 35 years when he would be 70 years old that somehow this factored into the jury's decision. There's no evidence Your Honor. You're assuming or you're asking us to assume that a jury weighing life versus death may simply have allowed to completely bypass them. A statement by the defendant who is facing that sentence then he would be eligible for parole and therefore out on the street possibly 20 years afterwards. We're to assume no no your point is it was that it was so isolated so fleeting that somehow this jury that had sat there during the trial of a homicide case involving three horrific killings would somehow not give any real weight to that statement. I don't think they would have your Honor. I don't think they would have especially since counsel invited them not to told them that his testimony was irrelevant. This came from Cross's own lawyer I just I believe that that is significant and the fact of the matter is before they reached their verdict they heard jury instructions from the court there was no for consideration of parole there was no mention of parole one way or the other that's right so again there was no correction of the misstatement but there's no reason for them to think that the misstatement was not correct because in the instructions there was nothing about parole one way or the other the the as you know of course the jury instructions from the court in Pennsylvania and in 1982 very specific in terms of how you reach the decision of life or death okay aggravating circumstances mitigating circumstances weighing them okay there's no room in that formula for any consideration about parole and I believe because of the structure of those instructions the jury the message sent to the jury would be we're not supposed to consider that we're supposed to weigh the aggravators and the mitigators and make the determination there was no room at all for that kind of a determination at all your honor and I believe at the end of the day and I understand the court's concerns about his violent nature but at the end of the day these crimes were so horrific and the proof of aggravating circumstances was so great that that this did not factor one way or another in the jury's decision there's no evidence of that unlike Carpenter and they have the burden of proof we can't just assume what was in the jury's head they have the burden of proving this well let me give you another distinguishing factor in Carpenter in Carpenter there was actually some ambiguity or some lack of clarity as to what the trial judge was actually responding to in the question there ain't no ambiguity as to what what he said was from my understanding I will spend 20 years before I am eligible for parole here for parole and nobody corrects him earlier he said if you send me to the penitentiary for life at least I could be released and get on with my life that is not definitive like the information in Carpenter that came from the court where the court said absolutely not but nobody was absolutely clear even on review as to what absolutely not was responding to in the Carpenter case right but I think the court the court went ahead and assumed that the absolutely not we had to assume there we don't have to assume here what's being said about parole you've read the words too I think it is I respectfully disagree that the court has to reach this conclusion that certain words uttered by a defendant whose credibility was nil that automatically those words are so serious that it if they weren't corrected means that he gets a new sentencing hearing I think the court is placing well way too much emphasis why would a reasonable jury a reasonable jury which we presume every jury is believe or not believe refuse to believe a defendant who states something to the effect that he will have an opportunity to be out on parole in twenty years why would a reasonable jury ever disbelieve if we put ourselves in the position of the jury and we hear this brief testimony from cross and then we hear his lawyer get up and say it's irrelevant and it doesn't matter what he says why should we disbelieve the jury it doesn't mean it ain't so it doesn't matter what he says why should a jury why should a jury disregard what a guy's own lawyer said to them well isn't it more likely that the jury would have gone along with whatever cross's lawyer was saying because that's his client I mean I think that's significant but if if the lawyer was trying to say don't believe him when he says I'll be out on parole why didn't the lawyer just say that the lawyer's statement was more powerful and broader than that because cross had said I stand before God almighty as an innocent man and the lawyer said don't believe him that's irrelevant we've gotten beyond that because the jury has found him guilty well the lawyer I don't believe limited his statement that it was irrelevant and it doesn't matter what  to a particular part of his testimony the innocence part I think the court's reading that into this but the bottom line is it was all of it so I will have you back Mr. Donam you are going first Mr. titas they have you out of order here I've never known you to be out of order hopefully not your other matter my name is Paul titus I'm here with Robert Donam representing Mr. Donam I will in fact be briefer than the 10 minutes that was indicated because in many ways I'm really second chair to Mr. Donam who knows this area of law much better than I do but I've lived with this case since 1970 when I was asked to undertake the case Mr. titus I don't know you are you you're not on the brief are you yes I am on the brief oh I see okay there I see I was looking you were all there is one matter with respect to this case and it's early history that I'm aware of it's in the record and I think it may put some of what's being discussed here in context this case received enormous media attention this is beaver county this is beaver county your honor it received enormous media attention and in the trial court proceedings before they ever went to trial in this case the district attorney agreed that it was unlikely that they could get a fair jury there was a change of veneer in this case there was and in fact the supreme court based on the finding of the president judge that you couldn't get a fair jury sent them to montgomery county to pick a jury in the case and the other reason I raise that is that at that time beaver county had public defenders the chief public defenders office he and the first assistant this case was then assigned to three and four years out of law school they had never tried a capital case this was the first capital case in beaver county since the death penalty was restored these two lawyers were totally inexperienced this was an overwhelming case and that fact pervades this entire record in what specific ways the failure to investigate which we raised throughout that there were many facts that should have been investigated they didn't even retain them they had the right to get an investigator they didn't they had a mental health report the judge had authorized the hiring of an investigator yes and they never followed up on it the mental health report itself puts them on notice of all the problems not only all the problems the likely family history and then says in there but he's not a reliable historian we can't rely on what he says what specifically should they have done what often troubles me in these ineffective assistance claims is that we are with hindsight trying to determine specifically what counsel should have done in the midst of what we all know is the hurly burly of trial and I will say more than any other kind of proceeding a capital homicide case because any of us who have tried them in Pennsylvania know that sometimes you can go immediately from the guilt phase to the death phase in this case I think maybe there were a couple of days in between there was an intervening hearing    they     is do it and we can do it and we can do it but we can do it and we can do it but we can  it but  can do  but we  do it but we can do it but       can do it but we can do it But we must do it But Because we must do it Because  must do it But we must do it Because  must do       Because we must do it Because we must do it Because we must do it Because we must do it  we must do it Because    it Because we must do it Because we must do it Because we must do it economy because it needs to work this way and it needs to work this way and we must do it Because we must do it Because we must do it Because we must        work this way because this must work this way and we must do it unconditionally. And I have  questions      You know, after the hearing, I had the ups and downs of the client's statement regarding innocence. Counsel says, you know, he's told you that he's innocent. You know the facts and you've declared the man did it. It doesn't matter what he says. Counsel could have said something along the lines of he did  We don't know the facts. I think we can   evidence presented in the case. We can't look at the evidence presented in the case. We can't look at the evidence presented in the case.  can't look at  presented in the case. We   the case fully believing the matter wasn't appropriate in the case. But that's something we can examined and make sure it's absolutely clear. Because in commonwealth v. Johnson in 1950, when the issue first comes up, the Pennsylvania Supreme Court and parole was available. The Pennsylvania Supreme Court makes clear it's doing this because it protects the defendant. Is there an absolute taboo to mention parole at all and some corrective that would have mentioned it? No, your honor. There was a prohibition against corrective remedies. There was an obligation on the part of counsel to do everything he can to protect his client. There's also an independent obligation, I would say, on the part of the court to make sure the jury is properly informed. You know what I wondered? I wondered whether Cross didn't set this up, whether Cross knew perfectly well he wasn't eligible for parole and just threw this in hoping, which happened, that he would come up with the works. How do we know that he didn't try to create a situation that he created by his own conduct? Because it was very clever if he did it because he's going to avoid maybe, I don't know what they do in Pennsylvania, the electric channel, whatever it is, but he's going to do it. Maybe he did this on purpose because there's no reason to believe, there's no reason, there's nothing in the record that would suggest that he did it on purpose. But how can we believe that? He had to know, I think, in view of his long time in custody, he had to know what the options were. Certainly his lawyer must have told him. I remember when I was in criminal, I remember one time telling a man you should have seen a surprise. I pointed out that at that time he was charged with kidnapping, which was a capital offense in New Jersey, which it was in the 60s, although I don't think I got executed for it. And I remember the expression on his face when he said, what could I get? I said, well, a death penalty. And he looked a little, I don't know, upset. But the question, though, is this. Certainly the lawyer must have told him the possibilities of what the sentence could be. I mean, where did the 20 years come from? Maybe the sentence was not in his  interest. Assuming that there was a strategy. The person was in  interest. Look what happened. It's gone on and on. Maybe he'll get a new trial later. And that's the story. I mean, people figure things out. I think you're suggesting a level of sophistication that Mr. Cross has never shown and isn't supported in the record. What we have here is a very mentally ill defendant with a history of decompensating under stress. The doctor himself is talking about him as being a reliable historian. And he is desperate. He's scared. He is facing the most difficult time in his life. I mean, he is getting out there talking to the jury begging for his life. It's improbable, Your Honor. And frankly, I would say the referee doesn't support it but also doesn't ultimately make a difference to the legal outcome. What did the defense counsel testify to in the PCRA proceeding  to what Mr. Cross said and any advices that were given by counsel to him on that board? Well, counsel testified to counsel testified with respect to having a brief conversation with Mr. Cross. The sole content that's discussed is whether Mr. Cross himself should get into information with respect to his personal background. Counsel says that well, first of all, that Mr. Rabeck and Mr. Cross didn't a report had not been developed so Mr. Buttigieg is the one who is dealing with Mr. Cross. And they suggested him that Did Buttigieg ever say or testify rather at the PCRA hearing that he knew that life meant life, that 20 years for eligibility was an inaccurate statement? He never testified that, did he? No, he did not. He did not testify that. So we don't know anything despite the conduct of a PCRA proceeding, just what Buttigieg himself knew to be sentencing law and parole eligibility at the time, let alone what he advised Mr. Cross on that point. Well, that's true, you're right. But let's think in terms of recidivism because this is an if-or. If he did not know, then obviously everything that he says to Mr. Cross is fatally flawed. Well, I'm not sure it hurts you. If he didn't know, he's plenty ineffective. If he did know and let this still play out as it did, you still have the issue that you've been arguing. That's right, Your Honor. In that sense, it's even worse because the issue, as you see it in Carpenter, is the counsel misses the issue altogether. There are definitely alarm bells that should have gone off and counsel does nothing. Here there is an indication in the record that after the surprise from the testimony, there's a brief conversation and Mr. Cross, and as a part of that conversation, they conclude that no harm has  and consequently there's nothing they should do about it. Well, frankly, Your Honor, that fact finding that they conclude that no harm has been done in my judgment, that's a proof of efficient performance because it is absolutely clear that there's been tremendous harm that's been done. When we take a look at the language in Carpenter and what the District Court here correctly talked about, just the inherent misstatement of law has, as Carpenter says, potentially devastating message. Highly prejudicial impact. It's a misstatement of the jury's true sensing options under state law. Dangerously misleading response, misleading impression, potentially devastating effect. All of those are quotes. That is from just the material misstatement of the law. For counsel to sit there after whether or not he confers with Mr. Cross about it and to perceive that no harm has been done is clear, clear evidence of deficient performance. It's objectively unreasonable. But it's even worse on the facts of this case given what it is that counsel was trying to present in mitigation. I mean, what we're talking about here, unlike Carpenter, this is a mitigation case that's dependent exclusively upon mental health testimony. Well, how do we know that any of it mattered? Maybe the jury, if they never heard the word parole, would have said, boy, what this man did is so horrible, we want a sentence of death. I mean, how do we know that they wouldn't think, who has the burden here and how heavy is your burden? You see, it cuts both ways, this question of how horrible it was. I can see the point that Judge Roth raised that they wouldn't want him out of jail. But maybe it was so horrible, or parole, I should say, excuse me, but whether it's parole or not, the mere fact that he was living after he performed or did these gruesome acts was so terrible he should have executed him. How do we know they wouldn't have come to that conclusion? Well, the standard is whether there is a reasonable probability that a single juror would have decided based on the evidence that a sentence of life without possibility of parole is enough for a severely mentally ill defendant. Well, how do we know that? I mean, the problem with it is that it's not like a measurable thing, you know, it's not like, boy, here's a test tube, we'll put in so much of this, so much of that, and this is what we have. I mean, it's very subjective. It's a reasonable probability of what a juror would do. And, Your Honor, I think your description right there that we don't know what the jury would do, that's a reasonable probability right there. Well, and what about the point that Mr. Carson raises that in Carpenter we at least had a specific inquiry by the jury relative to  That is absent in the instant case. That's correct. That's correct. And that strengthens our case, Your Honor. And let me explain to you why it strengthens the case. It's funny because we do it all the time. We say, well, we think that that wasn't really a harmful, you know, not in this context, but all kinds of cases. Well, Your Honor, here's why the absence of a question strengthens the case. In Carpenter, the jury asked the question because it was confused. In this case, there is no confusion. It is absolutely clear from what Mr. Cross says that he believes that he's eligible for parole after 20 years. And the fact that it goes uncorrected. And the fact that it goes uncorrected. And the jury would have expected it to be corrected if it was wrong. But he only said he believes that. Which is not the same thing as saying that he is. They only know that he has in his mind that he is. He never said he was eligible for parole in 20 years. He said, and that's what he said, I believe that. Well, that's fine. We believe that. We believe you that in the case. I think taking a look at that question, the jury will take that as he's eligible for parole. If there's any question about what the belief is, it's how many years. And here's what the jury has already seen here. The jury has already seen because the prosecution as its first evidence presents his prior conviction from Virginia. The evidence comes in that he was convicted for an offense for which he could have been sentenced to life. That was also part of the commonwealth's case. He got sentenced to 15 years and then he got parole after five. They also know from the second witness that not only did he get parole after only five years, but that he was unsupervised after six years. So you get parole and you're unsupervised and then he commits this murder while he's on parole. We're talking about 1982, which is a time in which the jury's common belief was in parole eligibility. And we know that from a variety of sources. If you take a look at the line of cases from Simmons, from Schaefer, from Kelly versus South Carolina, in those cases the United States Supreme Court makes clear that the common sense perception of jurors, of a defendant's eligibility for parole from a life sentence had not yet begun to be dispelled. You're talking about cases from the late 80s going to the 90s. Here we're talking about 1982. There's even greater reason to believe that the jury's here had a common sense understanding that he'd be eligible for parole. That sense that they have is ratified by the evidence about his prior parole eligibility and the fact that he was out on parole. That sense that they had is ratified by his statement. They were prone to believe that. And with all of those things in play, they would have expected if Mr. Cross had been wrong that there would have been correction from somebody. Now, Mr. Carusone says that there was a de facto curative instruction by the court. There's not. The court gives a generic instruction on how the jury is to weigh aggravating and mitigating circumstances. And in that instruction, the closest it comes to anything about the meaning of a life sentence is to tell the jury that they have to  death and life. It doesn't say life with. It doesn't say life without. Okay? So what you have as an instruction that follows up is completely nonresponsive to the statement that Mr. Cross has made. This case is worse than Carpenter because the jury had no need to ask the question. And we also know this because of what the United States Supreme Court said in Kelly versus South Carolina. In Kelly, there is no question from the jury. And defense counsel has affirmatively gotten up and argued that Mr. Kelly is never going to be out. He's going to spend the rest of his life in jail. He'll never see the streets again. And the court says that's not enough. I do have another question. Mr. Dunham, you argue in your childhood of the mistreatment, the abuse, and also there should have been evidence of his good adjustment to prison, his helping the prison authorities, which is why he was released. And that evidence, if the jury had been able to consider life without parole or death, might have persuaded the jury to believe that they should have considered that. But a lot of that was not before the jury. A lot of that is in your argument that the counsel were ineffective for not adequately  case. If we should decide that not correcting the statement is ineffective assistance of counsel, was there enough before the jury to give them, as Judge said,   of his good adjustment to prison? Is there enough before the jury without more that the jury could have decided what this man did was due to his terrible childhood, and he does adjust to prison, or would they simply have said, well, this is an awful guy who cares? Yes, Your Honor. The answer is yes, there is enough without this evidence. And with this evidence, it's even worse. The reason that there's enough with the evidence is just take a look at what the mitigation case was. And remember Pennsylvania is a weighing state. There are only certain things the state is able to consider as reasons for death. Future dangerousness is not one of them. What you have here is a mitigation case in which there's mental health testimony that the defendant has an extreme mental and emotional disturbance, that he has significantly impaired capacity to conform his conduct. You have evidence of lifetime personality disorders and so forth. All of that is evidence the jury can conclude is a reason that this sense of life without possibility of parole would be enough. We could spare this defendant's life because he's seriously mentally ill. The real problem here, the extreme problem here, is that it takes what's supposed to be very strong mitigating evidence and converts it into aggravating evidence. Because it emphasizes all the violent propensities, all the things that Dr. Eberly talked about, all the things that were followed up  Drs. Leavitt and Melnick. And it takes what should be strong mental health evidence and a strong reason to spare a mentally ill defendant's life because life without parole is enough. And it flips it on its head and makes it very, very aggravating evidence. It changes the entire dynamic of the jury's penalty phase deliberations. There's a reasonable probability based on that alone. And we think we're entitled to relief on that. With respect to the new evidence, it's absolutely clear that if counsel had simply done their job and collected the Virginia prison records, you know, they tried to use the Virginia prison records that the Commonwealth came forward with. If they had done that and they had been able to show that Mr. Cross actually went in prison, had a favorable adjustment to prison, is not a future danger in prison, is a good citizen in prison, somebody whose history of abuse is very different. We understand your position, Mr. Dunham, and thank you. And we'll have Mr. Kessler back on rebuttal. Thank you, Your Honor. Thank you, Your Honor. Judge Roth, following up on that last question you asked and Mr. Dunham's last comment, the Virginia prison records say almost nothing. Where they get this argument that from the prison records that somehow Cross was a hero inside the prison, there's no evidence of that. There's no affidavits from prison personnel talking about how well he did in prison. There are these ambiguous typed comments in four pages of the Virginia  that say he was           well he did in prison. There's no evidence from the prison personnel talking about how well he did in prison. There's no evidence     about how well he did in prison. There was discussion about this other additional evidence  from his two sisters. When you look closely at that additional evidence, there's a lot of things in there that are not favorable to Cross that would have played right into the Commonwealth's hands. Rose Lucien testified or indicated in this interview that was submitted and considered by the court that Cross was baby as a child. That he was always blaming others for his problems. That his stepfather was constantly getting Cross out of trouble. That Cross never had to face the music and that he should have faced the music. She also indicated in that statement that the stepfather loved Cross and was good to him. The assumption here that putting these two sisters on the stand is what effective counsel should have done. All of this other bad stuff is going to come out with it. It's definitely a mixed bag when it comes to this prior family history. Getting to Carpenter and I know Judge Roth and Smith you're concerned about counsel not requesting a specific jury instruction and the court not giving it. I asked this court what's the difference between a jury instruction which generally or indicates what the jury is supposed to do and excludes any consideration of parole versus the instruction that your Honor would have wanted which was a specific instruction telling them don't consider parole. The jury instruction was not the only possible way to correct the misstatement. There could have been an objection or I don't know can you object to your witness's statement. Counsel could have risen and said I'm sorry your Honor my client has just testified as to a misstatement of law could I ask the court to clarify to the jury that life imprisonment is without possibility of parole. Your Honor I would just respond by saying that is highlighting the testimony. I mean there is a misstatement. The whole problem is the testimony. It was flat out wrong. But to make it worse. Counsel could also have if it obtained an instruction also have relied on that instruction and argued in the closings. I think he effectively did that your Honor by saying to the jury   imprisonment is without possibility of parole. I understand the question. Judge Greenberg. Usually highlighting comes up when the person said something that might not be wrong but is very prejudicial. You don't want to highlight it. In this case I don't think you can use that because you are highlighting it to say it is disregarded because it is wrong which is different than it is prejudicial. I understand. But again you are still reinforcing it to the jury. I don't understand that. You are reinforcing that it is true. Sometimes it is wise to just let it go. Especially since he was up there for all of a minute and uttered about nine sentences. If all you are doing is drawing attention to it then I would agree with you it is best to let it go. But the contention is that it should have been corrected. That doesn't draw attention to it. That says it was wrong. Attention is no longer a problem with a judicial declaration that the statement by the witness was wrong. I think that there are instances where counsel does not correct something because they don't  what they are doing. I think that the argument should be transcribed just in case we should want to employ it. Having thanked counsel we will take the case under advisement. Thank you. Thank you. Please rise.